Eric M. Levin  the distinction between recharacterization and equitable subordination is recharacterization looks at the substance of the deal. You look past form. Necessarily, you're going to have factually specific cases. I think if you were to search recharacterization cases, you'll find the factual situation varies immensely. In the Dornier case, you're talking about invoices that had the time and that was viewed as a loan, which ultimately became an equity infusion. Other cases, you have clear loans that become equity infusions. The power doesn't have a limit. It's not statutory. There's no limit that says you cannot, in this situation, recharacterize debt, but in this situation, you cannot characterize debt. The situation varies from time to time. The court looks at 11 factors. The first factor is what is the name of the instruments? In this case, there was a settlement agreement. The settlement agreement was entered into by Province Grand Old Liberty, a company called Kiltz, Howard Jacobson, who was a guarantor, and Richard Wolfe, who was the manager, also a guarantor. PEM Entities was not a party to this settlement agreement. What this settlement agreement did was it settled Province Grand Old Liberty's obligations with Paragon, the bank here. So this debtor enters into a settlement agreement with the bank. The settlement agreement recites in paragraph 3.2 that this settlement agreement is in settlement of the obligations with Paragon Bank. As part of the settlement agreement, PEM Entities agrees to purchase the note. Yes, that's a separate agreement, but they agree to do it as part of the settlement agreement. It's in the joint appendix that PEM never negotiated this deal. PEM didn't negotiate the purchase of the note. The purchase of the note was negotiated by the debtor. PEM simply purchased the note. The note was funded by the debtor's own property. Three-quarters of the money came from the debtor's own property. The second prong is, is there the presence of a fixed maturity date, a presence of maturity date, or a schedule of payments? The third prong, is there a fixed interest rate? They're not here. The note gets purchased from Paragon. The way payments are made is every penny that the debtor collects is funneled to PEM Entities. The debtor at this point is an empty shell that simply is funding PEM Entities. The interest rate, according to the Paragon note, is Wall Street Journal Prime plus 1%. There is no records. There are no ledgers. There's no record of payments. Nobody tracks the interest rate. Nobody knows what the interest rate is because there's no record of interest being made. This isn't really a loan. This is a funnel of money from Providence Grand Old Liberty to the debtor. And then, in fact, the fourth prong is, what's the source of payments? The source of payments is solely the money that the debtor is making on its property. The fifth prong is the adequacy of capital. How adequate is the capital that the debtor has? The debtor has none. The debtor's quarterly fees in bankruptcy are paid by its members. The debtor has no money. In fact, what happens in this transaction? There was a transaction in December where roughly $400,000 went to PEM Entities in payment of this loan. PEM Entity made what it called re-advances back, $150,000 re-advance, a $60,000 re-advance, a re-advance of a loan of $3,500 to Howard Jacobson. Money is coming back to the debtor to handle its daily capital outlays because the debtor has no capital. The sixth is the alignment between the two. The Auto Style case talks about the situation where you have perfect alignment. If you have perfect alignment between the shareholders and the creditor, if they're the same people, then that's clearly a sign that this is equity, not debt. The Auto Style case says that if there's not perfect alignment, then it tilts slightly in favor of this being debt, but it's certainly not dispositive. It's dispositive the other way. It's dispositive if there is perfect alignment. That is dispositive of them being the same thing. But if there's a difference, in this case, the members of PEM are Stanley Jacobson, Robert Cannati, Robert Bright, and AJHLT, which is a trust that Howard Jacobson is, it's Howard Jacobson's children, which are Stanley Jacobson's grandchildren. The PEM was originally formed solely by Stanley Jacobson. At the time of the purchase of the note, there was this group. All but one were members of Providence Grand Old Liberty, and the one that was not was this trust. Ultimately, some other members were added, but that was after this transaction, and even then, there was only one who was not a member of Providence Grand Old Liberty. Seven is security. What was the security for the transaction? When you look at security, and the court thought it was important that you look at the money that came back in, these re-advances, because the security for this loan was the original deed of trust from Paragon, and yet money flowed freely between these two entities, and there's no particular accounting for what these re-advances were, how they're accounting, how do they reduce the loan, and in fact, the plan, the Chapter 11 plan, as originally proposed, would have reduced the, basically given PEM the land above $3 million, so that there was this huge increase in PEM's $300,000 investment that happened almost immediately. Eight is whether the company has looked to other sources of financing. In this case, it has not. There's no evidence in the record that Providence Grand Old Liberty looked anywhere else. This source of financing was its own internal, well, the source of financing was, first of all, Paragon Bank back. It was Joseph DiGlomeni and Joseph Simone who had this $900,000 deed of trust pledged by the debtor's land, and then it was also the $300,000 injected by PEM. Nine is subordination to other creditors. In this case, this is actually significant when you're saying, are these two the same transaction? The way the loan was originally set up when Paragon Bank owned it, Paragon Bank was the first position. After this transaction, PEM subordinated itself to two creditors, to Paragon Bank's new $292,000 loan and to this $900,000 that were borrowed against the land. But so that the subordination, is this a debt, is it equity, it tends to lean toward equity, since equity holders in a bankruptcy are in last position. The 11th factor is a sinking fund, which is more something you'd see in a bond situation, but there certainly is no evidence that there's a sinking fund here. The important thing for the court to keep in mind is priorities in the bankruptcy code, and that's precisely what these both recharacterization and equitable subordination are about. They're about determining the proper priorities of creditors, and that's precisely what the bankruptcy court does and what the bankruptcy court approaches. Under the bankruptcy code's system of priorities, equity holders come last. As I've said, the effect of this transaction were to stand is that the equity holder, PEM, by taking $300,000, which funded a settlement agreement, I think that's the point of this, is PEM's contribution was a contribution to a settlement agreement of Providence Grand Old Liberty's debt. By doing that, what the court has said is that it put itself, or should have put itself, behind the other creditors with this $300,000 infusion of cash. The debtor could have handled it multiple ways. As the court says, the debtor could have accounted for this equity infusion by increasing a capital stake or by doing something that acknowledges that these shareholders are injecting funds into the debtor. The importance of the – Let me interrupt you just a second. Yes, sir. If the foreclosure proceedings had gone through, what would your client have gotten? Well, first of all, Your Honor, if the foreclosure proceedings had gone through, we would not have been in bankruptcy. And I think outside of bankruptcy, this is a very different transaction. I mean, outside of bankruptcy, had the foreclosure gone through, the bank would have taken back the property. That's undeniably true, Your Honor. But by going into a Chapter 11 bankruptcy, what happens and the way the court looks at it changes. We're not talking about the world outside where there would be a foreclosure. We're talking about the world inside of bankruptcy where the judge's priority is to reorder claims. That's a long way of saying nothing. To answer the question, nothing. Correct, Your Honor. They would have gotten nothing outside. But that's often true of creditors when companies go into bankruptcy is they get nothing. And the reason a company goes into a Chapter 11 bankruptcy is to reorganize. I think that's what the loyal opposition with the other side is saying, that recharacterization is you recharacterize the loan that Paragon made in the first instance. If you say no, you skip down to this arrangement. Well, no, Your Honor. I think that the distinction, and the distinction is made in the Cold Harbor case, between looking at the transaction ab initio or looking at the transaction later. What I believe that's talking about is the distinction between recharacterization and subordination. Subordination is about conduct. It's did this person act badly. That happens later. That's not at the beginning. Recharacterization looks at the transaction ab initio, looks at it when it begins. If we were to say that you can purchase a note and you can do it by as inequitable a manner as possible, the debtor can just simply throw their money into it, you've created a massive loophole. If you're saying that you're going to create a new requirement for recharacterization, saying that recharacterization does not apply in the case of purchase of a note, which is what this would be. This would be carving out an exemption. And I think there's nothing in the case law that says a bankruptcy court can't look at this transaction. And the transaction is when did the insider put money into this note that created a claim. Because the claim that was filed in this bankruptcy was not filed by Paragon Bank. It was filed by PEM Entities. So that's the claim we're looking at. We're looking at the claim of PEM Entities. We're not saying go back in time. We're saying go to the transaction that created the claim. And the transaction that created the claim was its purchase. And I've already recited why these 11 factors, and it's unusual when you look at the cases, for these 11 factors to line up so cleanly on this transaction. I mean, the defense we've got is not that the 11 factors don't line up cleanly on this transaction. It's look at another transaction. You know, if you look five years ago, then it's a completely different deal than look at where we are at the time that PEM purchases the note and how PEM purchased the note. Because, again, that's the important part of recharacterization. It's how did this transaction happen. And the 11 factors are just an elaborate way of looking at this transaction. And it's not the original transaction. The original transaction with Paragon Bank was a different deal. And if Paragon Bank had been the creditor here, I think we wouldn't have an argument for recharacterization. But given that it's an insider who's done this, done it with the debtor's money, and I think, Your Honor, that's an important part of this. I mean, the whole beginning of this, the whole allegation is that this land was purchased using the plaintiff's money, using the money of the appellees from Lakebound Fixed Return Fund. That's how this whole thing came to be. And then we've gotten here. And we've gotten here because the debtor has used its resources to settle its loan with an agreement called a settlement agreement. I mean, that's unusual in the context of an ordinary note purchase. An ordinary note purchase, you have the note purchase you have in a lounge. You have something that transfers the note. It's negotiated by the third party. It's undisputed that PEM had nothing to do with the negotiating the note other than being represented in the transaction by the principals of the debtor. I mean, PEM didn't negotiate this purchase. It was purchased in the context of a settlement agreement. And, Judge Traxler, I think your point is important that outside of bankruptcy this looks very different. I mean, if we were not in a bankruptcy proceeding, there'd been a line drawn. A foreclosure hadn't happened. I think if we'd gone into it, there's no remedy in a district court that lets a district court do this. I mean, there's no lawsuit that could have been brought to challenge this transaction outside of bankruptcy. But once we're in bankruptcy, the court is charged with determining the priority of claims. And all sorts of things happen that recharacterize claims. I mean, equitable subordination is one of them that happens within bankruptcy, but it doesn't happen outside. And, Your Honor, I mean, in bankruptcy you've got companies that could well have completely folded, but don't. What we're saying is not that PEM won't get paid. We're saying they'll get paid in order. Hopefully there'll be enough to go around if these clients get a judgment to benefit the shareholders of Providence Grand Old Liberty, but that the shareholders should be treated as shareholders when they've taken the debtor's property and used it to fund a settlement agreement for the debtor and couched it as the purchase of a note. And I think that's the important thing about the form versus substance. There will always be paper for the deal, and the paper will always document a transaction. And the court will always, in a recharacterization, look past the paper to what really happened. And for that reason, Your Honor, I ask that you affirm Judge Dowd's order. Thank you. Thank you, Mr. White. Mr. Norton, you have some time in reply. Your Honor, it's interesting because both Mr. White and I emphasize the same factors in a test. In the cases, we don't have completely divergent cases. The essential point is that as I read auto-style plastics, and as I read all the cases that have followed auto-style plastics, I believe without exception, they have all said when you look at recharacterization, you look at the original transaction. Mr. White reads the same cases and says, nope, you've got to disregard that point. What we've got to look at is part of the series, the stream of events that I'm more focused in. Just as you can't look at a part of an interview transcript in a prior case that you heard this morning, you can't isolate and look at something downstream and say, well, now this thing has changed. Just because this company went into bankruptcy, it's not like we walked through the looking glass here. They have some fundamental rights and obligations that do not change. One of the things that doesn't change when you file a bankruptcy case is the secured claim, the dignity of the lien, the promissory note. This is a negotiable instrument, a promissory note secured by a properly recorded deed of trust that secures a $7 million debt. The transfer of that document, that obligation, that bundle of rights from Paragon Bank to PIM Entities was not done in the settlement agreement. It was not done by any means other than by a note sale agreement, and that's part of the appendix. So quite clearly, a valid existing first deed of trust on the property that existed before the bankruptcy and was transferred from a bank to PIM Entities before the bankruptcy still sat there. When I listened to Mr. White's argument, I got the impression that the deed of trust had vanished. He says that. It has not. The deed of trust was not canceled. In fact, throughout the appendix, and they're highlighted in our brief, I couldn't do it off memory, but throughout the appendix it points out numerous places in the record on appeal that establishes clearly the deed of trust was not canceled, the deed of trust was not released, the note was not compromised, the guarantees were not released. They still sit there today. That property still sits there today as bankruptcy is just sitting on hold waiting to see whether or not it's a valid first mortgage on the property. And if it is, as we contend it is, always has been, and still is today, then it's entitled to be paid before Mr. White's clients get anything. And it's a distraction from the key issue before this Court to try to focus on all these other ancillary events. For instance, to try to say that the settlement agreement somehow is this terrible thing that converts what PIM was willing to do into an equity interest is, with all due respect, nonsense. What the settlement agreement did was that the debtor worked out and negotiated an agreement with the bank to deal with a couple of problems. There was more than one loan that was addressed in the settlement agreement. One of the things that was accomplished by the settlement agreement is that Paragon Bank agreed that it would sell that loan for a discrete amount of money, in this case to PIM Entities, for $1,242,000. That was job one accomplished. Paragon Bank agrees, yes, if you give me that amount of cash, I'll sell it to PIM Entities. PIM, you can raise that money however you want to. Secondly, there was an entirely different loan that was dealt with where the parties agreed that the bank could take that loan through foreclosure and would credit bid a certain amount and all that stuff. Totally irrelevant to what we're talking about here, but it was part of the settlement agreement. My client was not part of the settlement agreement. My client simply said, if you get the bank to sell me that loan for $1,242,000, I'll buy it. And then I'll ride this recession out and see if I come out with a profit. That's a great deal. There are people that do that every day of the week in bankruptcy courts across the country. Nothing changed. So once the settlement agreement was negotiated, then it had to be implemented. So PIM Entities said, okay, I've got to come up with $1,242,000. Stanley Jacobson and his wife and another individual put in $300,000 into PIM. They didn't put money into the debtor. They funded PIM. PIM went out and borrowed money from two other individuals, and they lent secured by a deed of trust on the property of the debtor, which is a separate issue. There's a deed of trust on the property as additional collateral, but at that point it was a junior deed of trust. And PIM said to them, if I'm able to buy the note, I will agree to subordinate the bank's lien to your deed of trust so I can pay you back, so PIM can pay them back. So what we have is money comes into PIM until it accumulates. I'm sorry. I'm out of time. Finish up yourself. Okay. All right. Money comes into PIM so it can implement the transaction, buy the loan. And it bought the loan, and nothing changed in the landscape when that loan was transferred. As you said, Mr. White's clients were out of the money then. They're out of the money now. This is just another event in bankruptcy court of grown men fighting about money. They want to get ahead of the bank lien. When the bank lien is now held by someone else, there is no basis in the bankruptcy code to let them do that. Thank you. Thank you. I'll finish up. Yes, finish up. Finish up. All right. We'll come down and greet counsel and then go.
judges: William B. Traxler Jr., Roger L. Gregory, Joseph F. Anderson Jr.